**DIETHELM & CO., Ltd., Libelant,**

v.

**S.S. THE FLYING TRADER,** her engines, boilers, etc., and Isbrandtsen Company, Inc., Respondent.

United States District Court
S. D. New York.
May 23, 1956.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, proctors for libelant (J. Edwin Carey, Melvin J. Tublin, New York City, of counsel).

Kirlin, Campbell & Keating, New York City, proctors for respondent (Edward J. Heine, Jr., L. DeGrove Potter, New York City, of counsel).

THOMAS F. MURPHY, District Judge.

This action having been heard by the court without a jury, the following are made

Findings of Fact

1. On January 12, 1949, libelant delivered and respondent, a common carrier, received 988 wooden barrels of 99% glacial acetic acid for shipment to Saï-

gon ·on deck aboard the S. S. Flying Trader.

2. Respondent examined the barrels presented to it and rejected a certain number as being unfit for stowage. The remaining barrels which were in apparent sound condition were accepted and a bill of lading was issued which contained on its face the notation "On Deck At Owners' Risk" and "988 Reused Bbls. 172 Bbls. Heads Warped."

3. Paragraph 7 of the bill of lading contains the following language: "In respect of goods carried on deck all risks of loss or damage by perils inherent in such carriage shall be borne by the shipper or the consignee but in all other respects the custody and carriage of such goods shall be governed by the terms of this bill of lading and the provisions stated in said Carriage of Goods by Sea Act notwithstanding § 1(c) thereof * * *."

4. Seven times between January 16 and January 22, 1949 during the voyage which commenced on January 14 the deck cargo in question broke loose from its lashings and was adrift.

5. When the vessel arrived at Saïgon March 22, 1949, ·80 barrels of libelant's cargo were leaking and short part of contents, 22 were empty and 18 were missing.

6. At no time during the voyage when the cargo was adrift were weather and sea conditions other than what might reasonably have been expected for the North Atlantic at that time of year.

7. Respondent has not sustained its burden of proving the exercise of due care and diligence in stowing the cargo or that the damage and loss were occasioned by a peril of the sea.

## Discussion

█ As a preliminary matter it is necessary to determine whether or not the terms of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. apply to the shipment in question. This determination is material for the purposes of allocating the burden of proof to the proper parties. Respondent contends that since the Carriage of Goods by Sea Act is expressly made inapplicable to on-deck cargo the libelant must prove negligence before it can recover. With this I cannot agree. While it is true that on-deck cargo is exempted from the terms of the Act, 46 U.S.C.A. § 1301, "there would seem to be no positive legislative expression to preclude the shipper and carrier from voluntarily contracting that the provisions of the 1936 Act shall govern their 'tackle to tackle' relations in respect to deck cargo. The practice therefore seems to be to carry deck cargoes 'at shipper's risk as to perils of the sea' and for every other legal relation conformably to the provisions of the COGSA of 1936. The Ponce [D.C., 67 F.Supp. 725], 1946 A. M.C. 1124." Knauth, Ocean Bills of Lading, p. 236. Such practice has received the approval of the courts. Waterman S. S. Corp. v. United States Smelting, Refining & Mining Co., 5 Cir., 1946, 155 F.2d 687; Uniao de Transportadores Para Importacao E. Comercio, Ltda. v. Companhia De Navegacao Carregadores Acoreanos, D.C.E.D.N.Y. 1949, 84 F.Supp. 582. Indeed, this would seem to be the plain intent of ·paragraph 7 of the bill of lading. The burden, therefore, is on respondent to prove either that the loss was occasioned by a peril of the sea or that it exercised due care and diligence.

██ A peril of the sea is incapable of precise definition. Each case must turn on its peculiar facts. The damage here complained of occurred in the winter North Atlantic. When the cargo first broke loose two days after departure from New York the *smooth* log books indicate boarding seas and a wind force of 5 on the Beaufort Scale. From time to time during the period from January 16 to January 22 when the cargo was adrift seven times the log books make reference to rough, heavy seas, spray on the weather side, occasional seas over the bow, decks awash with spray and severe pitching and rolling. It also appears that from time to time it

was impossible to take soundings of the bilges, that water lights were torn loose, reel covers torn apart and the cement broken in the starboard chain pipe. Never at any time did the wind exceed Force 8. None of this gives indication of any unusual conditions. The respondent accordingly has not sustained its burden of proving that the damage to the cargo was caused by a peril of the sea. Cf. The Vizcaya, D.C.E.D.Pa.1945, 63 F.Supp. 898.

It is also urged that the loss resulted from an inherent defect in the goods or from their faulty packaging. It appears that of the 1265 barrels of acid presented for shipment 277 were rejected as unfit for stowing. All of the 988 barrels finally received were re-used barrels, and of these 172 had warped heads. However, both Captain Tang, who had charge of respondent's terminal operations and Mr. Boyle, the chief officer, testified that the barrels actually stowed were in apparent sound condition. Respondent argues, and it is not rebutted, that the security of the stow depends upon the strength and integrity of the barrels contained within it. Thus, should a defective barrel collapse the remaining barrels could shift around within the stow and this might well cause the damage complained of. No proof was offered that this was what actually happened; it was merely suggested as a possibility.

■■ Respondent urges that libelant must affirmatively prove that the goods were in good condition and free from inherent vice when shipped, and that inasmuch as libelant is utterly unable to do so the action must fail. While it is true that this burden may rest on libelant in certain circumstances where it is shown that the stow is proper and the alleged defect unobservable, e. g., Kasser Distillers Products Corp. v. Companhia De Navegacao Carregadores Acoreanos, D.C.S.D.N.Y.1948, 76 F.Supp. 796, such is not the case here. Where respondent fails to prove proper stowage and the suspected defect is capable of detection by the carrier, the clear language of the statute, 46 U.S.C.A. § 1303(4) may not be disregarded. "The statutory policy permitting a reliance upon bills of lading is an important one and should not be undermined for the reasons advanced. * * * The present bills are bereft of any indication of the damage here found when the cargo was outturned * * *. Where the goods themselves contain some basic, inherent, and hidden defect there may well be occasion to require proof of good condition upon delivery, but here with the type of goods involved there seems so obvious an opportunity for inspection * * *" that a possible defect in the barrels "should not be an excuse to the carrier to avoid the normal effect of its bill of lading." Kupferman v. United States, 2 Cir., 1955, 227 F.2d 348, 350. This conclusion is strengthened in the present instance by the fact that respondent did inspect the barrels and reject some for the same defect which it complains of now.

Respondent offered the testimony of four witnesses with respect to the manner in which the barrels of acid were stowed in an effort to prove that it exercised due care and diligence. In general terms these witnesses testified that the cargo was stowed on the main deck, port and starboard side forward in way of hatches Nos. 2 and 3, and port and starboard side aft in way of hatch No. 4. The barrels were placed one tier high in a vertical position abutting one against the other, atop a single floor of dunnage laid athwartships on the deck and 4 x 4's were arranged around the boundaries of the stow and toe-nailed to the dunnage. A kicker plank of dunnage was then placed around the base of the 4 x 4's and nailed to the uprights. Strips of dunnage were nailed to the horizontal runs about 6" apart so that an open crate was constructed on all four sides of the cargo, and a lattice of dunnage was nailed on top of the barrels. Capping was put on all the way around. The entire crate was lashed to the deck by means of ⅝" wire rope secured to padeyes on the deck and led over the top of the stow in such a manner that turn-

buckles could be used to take up the slack. Dunnage was also placed over the cap to ease the lateral strain of the turnbuckle arrangement. Chocking was placed between the 4 x 4's and the coaming and the bulwark, and wire was attached to each end of the stow to prevent fore and aft motion. Finally, filler was used to take up any free space between the barrels.

It was further testified that the S. S. Flying Trader was a Victory ship with an 8' raise forecastlehead and 3½' bulwarks and hatch coamings. The barrels stood about 2' 10" high. When the ship left New York she was almost but not quite down to her marks and was 10" down by the head.

 Of the four witnesses called, Mr. Ingvolstad, the marine surveyor, admitted that he had only a faint recollection of the manner of stowage; Captain Tang stated that his testimony was based on standard procedure; Staikoff, the second-mate, while insisting that he could clearly remember the stow was forced to admit at the time his deposition was taken late in 1955, that he had no present knowledge of the details of the stow and was in no way concerned with the loading of the cargo. The testimony of Edward Boyle, chief mate, was offered by deposition dated November 1, 1955. He was not then cross-examined as to the extent of his recollection and unfortunately there was no opportunity at the trial to remedy that oversight, but I have grave doubts concerning his ability to remember the stow in such minute detail nearly seven years later. Inasmuch as it appears to me that all this testimony was predicated upon usual practice and procedure rather than any clear recollection of what in fact actually took place, I find that the respondent has not sustained its burden of proving the exercise of due care and diligence. Since this is so I am unable to attach any weight to the testimony of the two experts called by respondent who stated that the stow was proper in all respects in answer to hypothetical questions based upon the above-mentioned testimony.

Since these findings are conclusive on the issue of liability there is no need to discuss libelant's theory of unseaworthiness.

## Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter.

2. Libelant is entitled to a decree.